574 So.2d 644 (1990)
Robert Lee SMITH, Executor of the Estate of Henderson Smith, Deceased
v.
Lorene SMITH.
No. 89-CA-0382.
Supreme Court of Mississippi.
December 19, 1990.
*645 Fred T. Rucker, Scales & Scales, Jackson, for appellant.
L. Abraham Rowe, Jr., Brandon, John W. Christopher, George Dewey Hembree, III, Montgomery Smith-Vaniz Firm, Canton, for appellee.
Before HAWKINS, P.J., and ANDERSON and PITTMAN, JJ.
PITTMAN, Justice, for the Court:

STATEMENT OF THE CASE
Robert Smith, executor of the estate of his late father, Henderson Smith, filed suit in Madison County Chancery Court, seeking to set aside a conveyance of real property made by Henderson Smith to Lorene Smith, Henderson Smith's daughter-in-law, on the grounds of incapacity to convey on the part of Henderson Smith, and fraud and undue influence on the part of Lorene Smith. After Robert Smith presented his case, the court granted a motion by Lorene Smith to exclude the evidence presented by Robert Smith and dismiss the complaint. Robert Smith appeals, assigning as error:
I. DID THE LEARNED CHANCELLOR, HONORABLE RAY MONTGOMERY, COMMIT FATAL AND REVERSIBLE ERROR IN UPHOLDING AND GRANTING THE DEFENDANT'S COUNSEL, MR. CHRISTOPHER'S MOTION TO EXCLUDE THE EVIDENCE OF THE PLAINTIFF, ROBERT LEE SMITH, AND TO DIRECT A VERDICT FOR THE DEFENDANT, LORENE SMITH, WITHOUT THE NECESSITY OF THE DEFENDANT HAVING TO PUT ON ANY TESTIMONY IN OPPOSITION TO THE PLAINTIFF'S CASE.

*646 STATEMENT OF THE FACTS
Henderson Smith was apparently a long-time resident of Madison County, Mississippi. Two of his children are mentioned in the record. One is Robert Lee Smith, the executor of his estate, whose residence is unknown but may have lived in Ohio. The other is James P. Smith, who died on April 21, 1983, and left as his widow, Lorene Smith, a resident of Cleveland, Ohio. On May 29, 1987, at the age of 83, Henderson Smith conveyed to Lorene Smith, by quitclaim deed, the following property, approximately 23.5 acres:
TOWNSHIP 8 NORTH, RANGE 2 EAST, Section 36:
From the NE/ corner of the South 15 acres of the NE/4 of the SW/4, above Section 36, run thence west 6.65 chains to the point of beginning; run thence North 5.6 chains; thence West 7.18 chains; thence South 5.6 chains; thence East 7.18 chains to the point of beginning; containing 4 acres, more or less, and being located in the NE/4 of SW/4, above Section 36; and any and all portions of this said NE/4 of SW/4, less the South 15 acres thereof and lying in Section 36, Township 8 North, Range 2 East, Madison County, Mississippi.
Exactly when Henderson Smith died is not in the record. It occurred sometime after he conveyed the land in question to Lorene Smith, and before November 12, 1987, because on that date Robert Smith was appointed executor of Henderson Smith's estate. On November 13, 1987, Robert Smith, as executor of Henderson Smith's estate, filed suit in Madison County Chancery Court, and on December 1 amended the complaint, seeking to set aside the deed in question. Smith alleged incapacity on the part of his father and fraud, deceit and undue influence on the part of Lorene Smith. The amended complaint also alleged that no consideration had been paid by Lorene Smith for the property. On December 9, 1987, Lorene Smith filed her answer, denying the pertinent allegations of the amended complaint. She did admit that she paid no consideration for the property, but affirmatively alleged that Henderson Smith intended to make the property a gift to her, his daughter-in-law.
After several delays, the trial in this cause was held on February 15, 1989. Dr. Allen Durfey was the first witness for Robert Smith. Dr. Durfey testified that he had first seen Henderson Smith as a patient in 1972, and had treated him off and on until Smith's death. Smith went to Durfey on April 15, 1985, complaining of confusion and a urinary tract infection. Durfey prescribed Hydergene to try to increase the flow of blood to the brain. Durfey elaborated on the "confusion", describing one who suffers from it as "someone who is not cognizant of all the surroundings that are happening around him." Durfey saw Smith again in November 1985, found that the confusion had increased, and increased the dosage of Hydergene. Durfey saw Smith in January 1986, referring him to a chiropodist for his feet; February 1987, when he referred Smith to an opthalmologist for cataract surgery; and in April 1987, when he treated Smith for a sore throat. Durfey had no reason to believe that Smith had recovered from his confused state, but made no record of Smith's mental state after the November 1985 treatment or during the subsequent visits. Durfey did state that, based on his observations in 1985, he did not think that Smith would have been competent after 1985. Durfey stated that he would not know what Smith's mental condition was after April 1987, the last time he treated him. Durfey acknowledged that Smith was an elderly man, and could not deny that Smith may have had lucid moments amid his confusion.
Christopher Price testified that he had been a neighbor of Henderson Smith's, moved away, and had returned to live in the community for the last twenty years. Price stated that Smith had helped him look after his father during his illness, and Price had reciprocated during Smith's last years. During his last four years, Price would help Smith pay his bills, conduct his business, get groceries, do laundry and take him where he needed to go, such as to the *647 doctor. Price testified that there was a time when Smith nearly lost some land due to failure to pay taxes, but Price took Smith to the courthouse and got the matter straightened out. Price mentioned that Smith was illiterate, only able to make an "X" as his mark. Price remembered seeing Lorene Smith around the Smith home a time or two the last year of Smith's life. Price testified that during his last two years, Smith was not capable of tending to any of his business, although Price admitted that he didn't have anything to do with Smith's property. Price stated that Smith had told him, in relation to his property, that "he was leaving it to his boy... ." Price further stated that Smith talked to him all the time about his son, Robert, that "he worried about the boy." Price thought that Robert lived "[s]omewhere in the North, in Ohio, he lived." Price denied knowing anything about the deed conveying the property to Lorene Smith, but did say that "I know he didn't know what he was doing if he done it any time during the time I was there." Price also denied that Lorene Smith had ever talked to him about getting a deed out of Mr. Smith in 1987. Price felt like Lorene Smith must have been aware of all the services he was performing for Henderson Smith. Price did not see Smith transact any business during the last two years of his life, and stated that he did not think that Smith was capable of it, saying that Smith's "mind just wasn't right." Price was the one who found Henderson Smith dead in his home.
Wilbert Robinson, former Madison County justice court judge, had been acquainted with Henderson Smith for several years, but did not spend enough time around him in his final years to be familiar with his mental condition. Robinson notarized the deed in question, executed on May 29, 1987. According to Robinson, Lorene Smith came into Robinson's store and asked him to notarize the deed. Robinson testified that Smith remained in the car in front of the store, and Robinson witnessed him make his "X" on the deed there. Lorene Smith then wrote Henderson Smith's name on the deed. When asked if he remembered Lorene Smith saying anything to Henderson Smith, Robinson answered: "In essence, and I don't really remember the details, but, ah, ah, I'm practically remembering that she said, `This is the deed that we was to sign,' or something in that nature." Robinson didn't remember anything more about the transaction, and could not recall any other witnesses. Robinson could not recall anything about Smith's actions which made him believe that Smith didn't know what he was doing. Robinson also notarized another deed for Henderson Smith, one by which Smith conveyed property to Bobby and Doris A. Hunter on August 4, 1987.
Frank Stimley, an attorney from Jackson, was retained by Henderson Smith and Smith's nephew, the Reverend Bobby Hunter, in July 1985. Stimley said that he "handed a blank sheet of paper to Mr. Smith and told him that this was a deed to his land where he was to sign his land over to me. Mr. Smith made, I believe, his mark on the paper and gave it back to me." Stimley did this to see if Smith could appreciate an earlier action, which Hunter and Smith had come to try and set aside. Stimley testified that at the time he gave Smith this "test", he did not "believe that [Smith] knew the full import of the explanation that I had given and the consequences of his action in signing that blank sheet of paper." As to whether he represented Reverend Hunter as well as Smith, Stimley stated that Reverend Hunter brought Smith to him and paid the legal fees, and it was his understanding that both Hunter and Smith got the benefits of the service. Stimley admitted that Smith expressed himself fairly well, that he could carry on an intelligent conversation, that he could respond to Stimley about the property he had, to the extent of the transaction for which Stimley had been engaged. Stimley felt that Smith could discuss and communicate with him sufficiently so that he could handle a legal matter for him. Stimley saw nothing in Smith's demeanor to make him feel that Smith was insane. In attempting to clarify, Stimley said that he felt one's ability to understand the effect or import of one's actions was different *648 from a question of competency or insanity. Stimley's testimony was a bit fragmented due to his fear that he might violate the attorney-client privilege.
Bentley Conner, a Canton attorney, had known Henderson Smith since 1980. Conner had represented Henderson Smith in getting a deed set aside. In 1983, Conner bought some land from Smith. They also discussed other land that Conner wished to buy from Smith and agreed on a purchase price. In May or June of 1985, Conner asked Smith if he was ready to go ahead and finalize the sale. Smith agreed, so Conner drew up a deed of trust and promissory note, procured a notary public, and went to Smith's house to have the deed executed. In June 1985, Conner was contacted by Frank Stimley, who expressed concern that the conveyance may have been fraudulent, or that Smith may not have understood what he was doing when he sold the land to Conner. Because of this Conner took Dr. Nelson Cauthen, a clinical psychologist, and went to visit Smith. Cauthen asked Smith a series of questions involving historical facts, such as the day of the week, the names of his children, and the number of acres of land making up his farm, which Smith had no problem with. But Smith did have problems with present cognitive abilities, such as planning what he would do on a certain day, or what he would have for lunch. As a result of the meeting Conner met with Stimley, Henderson Smith, and his son Robert, and reconveyed the land back to Henderson Smith. It was at this meeting that the test concerning the execution of the blank sheet of paper, mentioned previously as part of Frank Stimley's testimony, took place. According to Conner, Henderson Smith was not only asked to execute a blank piece of paper, which he did, but was also told that the "test" conveyance involved the property Smith had already conveyed to Conner. Conner testified that he felt that Smith felt that conveying the land meant following through with an old obligation, that Smith did not realize he could refuse to go through with the deal, and that he did not understand the consideration for the property. In short, Conner did not feel that Smith knew what he was doing as far as deeding the property to him in June 1985. According to Conner, who had served as chief public defender for Madison County and had handled a number of lunacy cases, Smith's mental condition would stay at a certain level for a time, then regress, then stay at that level for a while, then regress, and so on, but there was never any improvement. Specifically, Smith began to forget to eat, then would forget to zip his pants, and later would forget to unzip his pants before urinating. He also became forgetful as to certain family names. Conner also stated that Smith's physical condition began to decline. Conner denied that Henderson Smith may have only appeared incompetent because of bad eyesight and the influence of his lawyer, Stimley. Conner also denied that he had conveyed the property back to Smith in order to stay out of a family or legal fight, saying that if he had felt Smith had been competent, he would have stuck to the deal. Conner did not prepare the deed conveying the property to Lorene Smith and was not present when the deed was executed. Conner maintained that Smith was in a state of constant mental decline from at least May or June of 1985 until the day he died, but admitted that he did not see Smith the last six months or year of his life, and not at all in 1987. This was because Robert Smith and Bobby Hunter told Conner that they did not want him around Smith anymore, as they did not trust him. Conner emphasized that he and Henderson Smith were friends, that he cared for the man, and that he saw to it that Smith was taken care of as far as cooking and cleaning, and also saw to it that Smith's home was maintained.
Willie Hunter was a long-time neighbor of Henderson Smith's. Hunter would go over to Smith's house and talk to him and would cut his grass for him. Hunter stated that Smith had gotten forgetful in his latter years, such that he might visit the mailbox twice in the same day. Hunter did not know about any business that Smith might have transacted in the last years of his life. As for company that Smith might *649 have had over his last years, Hunter mentioned a cleaning lady and Christopher Price, who took Smith to the grocery store and helped him take care of his business. Hunter knew that Smith couldn't see, but didn't know he had cataracts. Hunter said that he might accept a dollar or a pack of cigarettes for cutting the grass, but nothing more. Hunter wouldn't say that Smith was crazy.
At the end of Robert Smith's case-in-chief, Lorene Smith moved the court to exclude the evidence and dismiss the claim against her. Lorene Smith alleged that Robert Smith had failed to prove that Henderson Smith had lacked the capacity to execute the deed in question, that Robert Smith had failed to prove that the deed had been procured by fraud, deceit, or undue influence, or that the deed was void, invalid, and not the voluntary act of Henderson Smith. After argument the trial court granted the motion and dismissed the complaint.

DISCUSSION OF ISSUES

I. DID THE LEARNED CHANCELLOR, HONORABLE RAY MONTGOMERY, COMMIT FATAL AND REVERSIBLE ERROR IN UPHOLDING AND GRANTING THE DEFENDANT'S COUNSEL, MR. CHRISTOPHER'S MOTION TO EXCLUDE THE EVIDENCE OF THE PLAINTIFF, ROBERT LEE SMITH, AND TO DIRECT A VERDICT FOR THE DEFENDANT, LORENE SMITH, WITHOUT THE NECESSITY OF THE DEFENDANT HAVING TO PUT ON ANY TESTIMONY IN OPPOSITION TO THE PLAINTIFF'S CASE.
Robert Lee Smith appears to have alleged in his amended complaint three grounds for setting aside the conveyance from his father to Lorene Smith: fraud and undue influence on the part of Lorene Smith, and lack of capacity on the part of Henderson Smith. Each of these grounds will be discussed separately. As for the standard of review, this Court has stated, in the case of a motion to dismiss under Miss.R.Civ.P. 41(b), the following:
Here the question presented to the trial judge, sitting without a jury, is whether, considering the evidence which has been offered by the plaintiff (which, of course, is all of the evidence then before the court), and giving it such weight and credibility as it would be entitled to were the trial judge engaged in making final findings of fact and rendering final judgment, the trial judge concludes that plaintiff has made out a case which if not rebutted would entitle him to judgment. The trial judge must, as a matter of law, deny the motion to dismiss and require the Defendant to go forward with his evidence if, and only if, considering that the evidence offered by the plaintiff were all of the evidence to be offered in the case, the trial judge would be obligated to find in favor of the plaintiff.
If, considering the evidence fairly, as distinguished from in the light most favorable to the plaintiff, the trial judge would find for the defendant  because plaintiff has failed to prove one or more essential elements of his claim, because the quality of the proof offered is insufficient to sustain the burden of proof cast upon the plaintiff, or for whatever reason  the proceeding should be halted at that time and final judgment should be rendered in favor of the defendant.
Obviously, when there is doubt, the trial judge generally ought to deny the motion to exclude and dismiss but such is the exercise of sound discretion, not obligation imposed by law.
Davis v. Clement, 468 So.2d 58, 61 (Miss. 1985). The finding in Richardson v. Langley, 426 So.2d 780 (Miss. 1983), relied on by Robert Smith, that the chancellor was required when ruling on the motion to exclude to view the evidence in the light most favorable to him, was labeled in Davis as "inadvertent dicta." Davis, 468 So.2d at 61 n. 1. In conjunction with this, this Court employs the substantial evidence/manifest error rule for any findings of fact made by the trial judge. Croenne v. Irby, 492 So.2d 1291, 1294 (Miss. 1986).

*650 A. Fraud

The elements of a claim of fraud are the following:
(1) A representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted on by the person and in the matter reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance upon its truth; (8) his right to rely thereon; (9) his consequent and proximate injury.
Anderson v. Burt, 507 So.2d 32, 38 (Miss. 1987). The elements of a claim of fraud must be proven by clear and convincing evidence. Cherry v. Anthony, Gibbs, Sage, 501 So.2d 416, 420 (Miss. 1987).
It appears that the issue of fraud was not even litigated by the parties, but since it was mentioned, a brief discussion is presented. Robert Smith, in his amended complaint, alleged "that Henderson Smith's name was fraudulently signed on said Deed ..." He also alleged that the deed had been obtained by Lorene Smith through fraud and deceit. Lorene Smith answered, admitting that "the decedent, Henderson Smith, signed his signature with an `X'," but denied any fraudulent acts. Practically the only evidence of any actions on the part of Lorene Smith came from the testimony of Wilbert Robinson, who notarized the deed in question. Robinson testified that Smith remained in the car in front of his store, and Robinson witnessed him make his "X" on the deed there. Lorene Smith then wrote Henderson Smith's name on the deed. Robinson's only recollection of any conversation by Lorene Smith to Henderson Smith was the following: "In essence, and I'm practically remembering that she said, `This is the deed that we was to sign,' or something in that nature." The trial court made no finding as to fraud, but specifically found that Henderson Smith's signature had been his "X", and attached no significance to the fact that Lorene Smith had actually signed Henderson Smith's name to the deed in question. Neither Lorene Smith nor Robert Smith were called to testify. It is clear that one cannot sustain a fraud claim, with a burden of proof of clear and convincing evidence, based on the sparse testimony contained in this record. The trial court's finding, or lack of one, in favor of Lorene Smith as to fraud was correct.

B. Undue Influence
Robert Lee Smith alleged that "Lorene Smith exercised undue influence upon Henderson Smith, Deceased, in obtaining the alleged signature on the deed" in question. The chancellor specifically found in his bench opinion that "[t]here was no showing by clear and convincing evidence as to any undue influence by the Defendant over the deceased." In order to set aside a deed on the ground of undue influence, this Court has stated that
the evidence must show that the will of the grantor was so dominated that free agency was destroyed and the deed became the deed of the person exerting the influence. The influence exerted, whether by means of advice, arguments, persuasions, solicitations, suggestion, or entreaty, to constitute undue influence, must be so importunate and persistent, or otherwise so operate, as to subdue and subordinate the will and take away its free agency. And it is the end accomplished which colors the influence exerted and entitles a court to speak of it as wrongful, fraudulent, or undue, on the one hand, and as proper and justifiable on the other.
Clark v. Magee, 234 Miss. 252, 259, 105 So.2d 753, 755 (1958) (citations omitted).
The first question, when there is the possibility of undue influence, appears to be whether there existed between the grantor and grantee a confidential or fiduciary relationship. Such a relationship is defined as follows:
A confidential relationship such as would impose the duties of a fiduciary does not have to be a legal one, but may be moral, domestic or personal. The relationship arises when a dominant, overmastering influence controls over a dependent person or trust justifiably reposed. Such a relationship must be *651 shown before we will scrutinize one's right to give away his property, for an inter vivos gift is a perfectly lawful means of transferring real property in this state.
The burden of establishing the existence of a fiduciary relationship is upon the party asserting it. Because of the severity of the burdens and penalties of the confidential relationship, the party claiming the benefits of the existence of such a relationship must establish clearly his entitlement.
Mullins v. Ratcliff, 515 So.2d 1183, 1191-1192 (Miss. 1987) (citations omitted). According to Miner v. Bertasi, 530 So.2d 168, 171 (Miss. 1988), "a confidential relationship alone is sufficient to raise the presumption [of undue influence] with gifts inter vivos." One of the cases Miner cites as authority for this proposition is Estate of McRae v. Watkins, 522 So.2d 731 (Miss. 1988). Estate of McRae seems to stand for the notion that the presumption of undue influence arises "when there is a fiduciary or confidential relation, and there is a gift or conveyance of dubious consideration from the dominant to the subservient party... ." Estate of McRae, 522 So.2d at 737 (emphasis added). Any conflict, real or imagined, is irrelevant under the facts of this case.
The presumption of undue influence which may arise in a case such as this is a rebuttable presumption. The process of rebutting such a presumption has been described by this Court:
When the circumstances give rise to a presumption of undue influence, the burden of going forward with the proof shifts to the grantee/beneficiary to prove by clear and convincing evidence:
(1) good faith on the part of the grantee/beneficiary;
(2) grantor's full knowledge and deliberation of his actions and their consequences; and
(3) advice of (a) a competent person, (b) disconnected from the grantee and (c) devoted wholly to the grantor/testator's interest.
Mullins, 515 So.2d at 1193 (citing Murray v. Laird, 446 So.2d 575 (Miss. 1984)). The third prong of this test was altered in Mullins, such that the grantee be required to prove "by clear and convincing evidence the the grantor exhibited independent consent and action."
This Court has provided multiple-factor tests for each prong of the rebuttal process. Miner, 530 So.2d at 171; Mullins, 515 So.2d at 1193-1196. A further discussion of these tests is not necessary, as the initial requirement, that of a confidential or fiduciary relationship, has not been met. As stated earlier, neither Robert Smith nor Lorene Smith testified. There is practically nothing in this record concerning the nature of the relationship between Lorene Smith and Henderson Smith. Christopher Price, who helped Henderson Smith take care of his business and run his errands, said that he saw Lorene Smith at Henderson Smith's residence a time or two that last year. The only other testimony involving Lorene Smith was that mentioned earlier as given by Wilbert Robinson. There is little in the record to suggest that there was any kind of relationship between Lorene and Henderson Smith, except for that imposed by marriage. This Court has stated that blood ties alone do not constitute a confidential relationship, Cunningham v. Lockett, 216 Miss. 879, 63 So.2d 401 (1953), and the same should be true in the case of those related only by marriage. There was no showing, by clear and convincing evidence, of undue influence by Lorene Smith over Henderson Smith and the chancellor was correct in so finding.

C. Lack of Capacity
The majority of the testimony in the trial below was concerned with Henderson Smith's mental capacity to execute the deed in question. The degree of mental capacity required in a case such as this "is that the grantor shall have had sufficient mental capacity to understand in a reasonable manner the nature of the transaction in which he was engaged and its consequences and effect upon his rights and interests." Moore v. Stone, 208 So.2d 585, *652 586 (Miss. 1968). This Court has further stated:
Well established in this jurisdiction is the long-standing rule that the burden of proving lack of mental capacity rests squarely on the party seeking to have such deed set aside. Clear and convincing evidence is necessary to establish this lack of mental capacity. Unless the proof put on by the party seeking to set aside a deed establishes that the grantor was permanently insane up to and beyond the time of the execution of the deed, the test of the grantor's mental capacity is to be applied as of the time of the execution of the deed.
Richardson v. Langley, 426 So.2d 780, 783 (Miss. 1983) (citations omitted). This Court has recognized that mental incapacity or insanity is not always permanent, and a person may have lucid moments or intervals when that person possesses necessary capacity to convey property. As was stated in Williams v. Wilson, 335 So.2d 110, 112 (Miss. 1976), quoting Ricketts v. Jolliff, 62 Miss. 440 (1884),
a lucid interval is not merely a cessation of the violent symptoms of the disorder, but a restoration of the faculties of the mind sufficiently to enable the party soundly to judge of the act. The evidence in support of a lucid interval, after derangement has been established, should be as strong and demonstrative of such fact as when the object of the proof is to show insanity, and it ought to go to the state and habit of the person, and not to the accidental interview of an individual or to the degree of self-possession in any particular act.
Dr. Durfey testified that Henderson Smith suffered from confusion, and was "someone who [was] not cognizant of all the surroundings that are happening around him." (T. 6) Dr. Durfey could not say that Smith still suffered from this confusion after November 1985, as Durfey made no notations as to this confusion during any of Smith's visits after November 1985. Though he did not feel that Smith would have been competent after 1985, Durfey did not actually observe Smith after April 1987, and could not have known what his condition was on May 29, 1987, the execution date. Durfey allowed that Smith could have had his lucid moments, although we are not sure that Durfey's understanding of the term "lucid" is the same as this Court's. Certainly, there is no proof that Henderson Smith had any "restoration of faculties of the mind sufficiently to enable" him to judge his act. Indeed, the proof is to the contrary: that there would be a steady deterioration of Smith's mental capacity.
Christopher Price performed many personal services and errands for Henderson Smith during the last years of his life. Price denied knowing anything about the deed in question or Smith's mental condition on the day of its execution, but did state that "I know he didn't know what he was doing if he done it any time during the time I was there." Price further stated that during the last two years of his life, Smith's "mind just wasn't right" and the record is replete with actions by Smith that confirm this statement.
Bentley Conner and Frank Stimley testified to great concern in June of 1985 that Henderson Smith had not understood what he was doing when he had earlier conveyed property to Conner. Conner and Stimley agreed that Conner should reconvey the property to Smith. Conner also testified that he had gotten a deed executed by Smith in the early 1980's set aside. Stimley testified that Smith could communicate with him sufficiently so that he could handle the legal matter in question, and saw nothing to make him think Smith was insane. Conner's testimony concerning Smith's mental condition, in light of his experience with competency cases, was the strongest presented in this record to support a finding of incapacity. Conner might have been an even stronger witness for Robert Smith, but, according to Conner, he was kept away from Henderson Smith for the last six months or year of Smith's life by Robert Smith and Bobby Hunter. Conner's stated opinion was that Smith was suffering from a constant mental decline from at least May or June of 1985 until the day he died.
*653 Willie Hunter testified that Smith had gotten forgetful in his latter years but could not say anything about Smith's business dealings. The two witnesses who may have had the most to offer as to Henderson Smith's mental condition, Robert and Lorene Smith, did not testify. Wilbert Robinson, the only witness to the execution of the deed, could not recall anything which led him to believe that Smith did not know what he was doing.
This Court has provided relief in certain cases involving lack of capacity, where the condition does not rise to permanent insanity or total lack of capacity. As was stated in Richardson v. Langley, 426 So.2d 780, 783 (Miss. 1983):
We have traditionally made a distinction between "weakness of intellect" and a total lack of capacity to execute a deed. Such a "weakness of intellect" when coupled with another factor, such as grossly inadequate consideration, or the existence of a confidential relationship may be sufficient to warrant the granting of equitable relief. Absent such a confidential relation, or grossly inadequate consideration, a "weakness of intellect" in and of itself, which does not rise to the standard of a total lack of capacity to execute a deed is an insufficient basis upon which to set aside a deed. This rule allowing an equity court to set aside a deed upon a finding of a weakness of intellect, plus another factor such as grossly inadequate consideration was even more clearly defined in Cunningham v. Lockett, 216 Miss. 879, 63 So.2d 401 (1953). Cunningham held that a weakness of intellect when coupled with grossly inadequate consideration did indeed constitute grounds for setting aside a deed. Nonetheless, we held that "weakness of intellect" required evidence of more than age and sickness on the part of the grantor. Such weakness must be a weakness of the mental faculties.
(citations omitted); see also Mullins v. Ratcliff, 515 So.2d 1183, 1190 (Miss. 1987) (citing Richardson).
It is clear that, when dealing with total lack of capacity, the critical date to be considered is the date of the execution of the deed. Alternatively, the party challenging the deed may show permanent insanity up to and after the date of execution. It is not so clear what the critical date is when considering the lower standard of "weakness of intellect" or "great weakness of mind." A review of the cases mentioning this lower standard seems to be concerned with the date of execution, but it is sometimes difficult to separate the analysis of this lower standard from that of total lack of capacity. See, e.g., Mullins, 515 So.2d at 1190 (critical question concerns dates of execution); Ladner v. Schindler, 457 So.2d 1339, 1340 (Miss. 1984) (husband did not understand nature of transaction because of age and illness; wife was exhausted from taking care of husband and "at or near the time of the deed's execution, her mind was stupefied"); Richardson, 426 So.2d at 783-784 (analysis involved date of execution); Patterson v. Ervin, 230 So.2d 563, 565 (Miss. 1970) (grantor alleged to be "extremely feeble in mind and body" at the time of execution); Puryear v. Austin, 205 Miss. 590, 602-603, 39 So.2d 257, 259 (1949) (court sets out testimony at length concerning "the mental capacity of Dr. Austin and his condition at the time of the execution of the deed in question"); but see Carter v. Knight, 252 So.2d 882 (Miss. 1971) (testimony as to mental and physical weakness of elderly couple not specific to date of execution). When one considers this lower standard of "weakness of intellect" or "great weakness of mind", the date of execution should be the critical time. Further, the "before and after" rule, applied in cases of permanent insanity, should not apply in cases involving a "weakness of intellect."
The deed in question involved 23.5 acres in Madison County. No value is provided for this property, but there is no proof of any requirement of consideration. Robert Smith has shown, by clear and convincing evidence, that Henderson Smith was suffering from "weakness of intellect" or "great weakness of mind," and there has been no showing of any restoration of *654 faculties. Therefore, the court should not have excluded Smith's evidence and dismissed the action. In Puryear v. Austin, 205 Miss. 590, 39 So.2d 257 (1949), there was detailed evidence presented to the effect that the grantor, Dr. Austin, was very ill and near death in a hospital bed at the time he executed the deed in question. This Court upheld the finding of the trial court that the conveyance should be set aside. In Cunningham v. Lockett, 216 Miss. 879, 63 So.2d 401 (1953), both sides presented conflicting evidence concerning the grantor's mental condition at the time of execution of the deed and afterward. This Court affirmed the refusal of the chancellor to set the deed aside. In Carter v. Knight, 252 So.2d 882 (Miss. 1971), the issue being litigated was fraud and not lack of capacity. The trial court heard testimony concerning the physical and mental condition of the grantors, but it does not appear that this testimony was specific to the date of execution. The trial court also heard, over objection, evidence of lack of consideration. The deed was set aside on the ground of fraud, and this finding was upheld on appeal. In Ladner v. Schindler, 457 So.2d 1339 (Miss. 1984), this Court found that it was clear from the record that both of the Schindlers were unable to understand a deed which they had executed because of age, illness and fatigue. Considering that there was no consideration for the conveyance, the setting aside of the deed was affirmed on appeal.
There is plentiful evidence that Henderson Smith was suffering from "weakness of intellect" or "great weakness of mind." A conveyance he had made in the early 1980's had been set aside. Another conveyance made in 1985 had been voluntarily rescinded by the grantee, Bentley Conner. Smith had people taking care of his housekeeping, his errands and some of his business affairs. There is evidence that in 1985 he was losing his faculties. Further, there is no evidence of any monetary consideration or any other consideration flowing to Smith for the execution of the deed. There is no evidence of any restoration of faculties. The case made by the executor is not totally conclusive. This is all the more reason why the trial court should hear the proof of the defendant, Lorene Smith.

CONCLUSION
This Court reverses the trial court and remands for further consideration by the chancery court.
REVERSED AND REMANDED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, ROBERTSON, SULLIVAN and ANDERSON, JJ., concur.
BLASS, J., dissents without written opinion.