# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2017-CT-00607-SCT

*CHASITY ANDERSON*

*v.*

*DARNICE WIGGINS*

## ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 11/29/2016 |
| TRIAL JUDGE: | HON. JOHN S. GRANT, III |
| TRIAL COURT ATTORNEYS: | JAMES B. GRENFELL |
| | JAMES N. SCARFF, II |
| | DREW MARTIN |
| | GRETA KEMP |
| COURT FROM WHICH APPEALED: | RANKIN COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | JAMES N. SCARFF, II |
| ATTORNEYS FOR APPELLEE: | THOMAS J. LOWE, JR. |
| | JAMES B. GRENFELL |
| NATURE OF THE CASE: | CIVIL - TORTS-OTHER THAN PERSONAL INJURY & PROPERTY DAMAGE |
| DISPOSITION: | REVERSED AND REMANDED - 02/20/2020 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**COLEMAN, JUSTICE, FOR THE COURT:**

¶1.   The Rankin County Chancery Court granted summary judgment in favor of Darnice

Wiggins in a conversion case she brought against Chasity Anderson, the fiancée of Wiggins's

deceased son Jhonte Sanders.   As the basis for granting summary judgment, the chancellor

determined that Anderson failed to establish a genuine issue of material fact.   Anderson

appealed, and the Court of Appeals deadlocked in a 5-5 decision.   Once the Court of Appeals

denied her motion for rehearing, Anderson filed a petition for writ of *certiorari*, and we granted it. Accordingly, we reverse the Court of Appeals' judgment, and we remand the case for further proceedings.

## FACTS AND PROCEDURAL HISTORY

¶2.     Sanders and Anderson met each other while serving in the military in 2009. The two lost touch with one another. In 2011, Sanders was diagnosed with leukemia while living in Chicago, Illinois. In May 2013, Sanders reconnected with Anderson online. Sanders then moved to Rankin County and continued his chemotherapy treatment at University of Mississippi Medical Center (UMMC). After suffering multiple seizures in 2014, Sanders required hospitalization. Following his hospitalization, Wiggins, Sanders's mother, moved to Jackson, Mississippi, and became his primary caregiver. On November 14, 2014, UMMC transferred Sanders to Methodist Rehabilitation Center (Methodist) in Jackson, Mississippi, for two weeks of rehabilitative treatment. Dr. Clea Evans is a neuropsychologist at Methodist in Jackson, Mississippi, and was a part of a team that treated Sanders the fourteen days he was there. Methodist released Sanders on November 28, 2014. However, Sanders continued outpatient rehabilitative-speech-therapy treatments from December 1, 2014, through January 2015. On December 19, 2014, Sanders settled a personal-injury claim and received a monetary settlement in excess of $350,000. Sanders made multiple transfers of those settlement funds to Anderson.

¶3.     Sanders died soon after the transfer of his funds. Following Sanders's death, the Rankin County Chancery Court appointed Wiggins, Sanders's mother, administratrix of his

2

estate. Wiggins filed a "Complaint for Conversion" against Anderson. Though other transactions occurred, the crux of Wiggins's conversion complaint revolved around transfers Sanders made after his personal-injury settlement. In support of her conversion claim, Wiggins alleged that Anderson was aware of Sanders's pending settlement, that Sanders qualified as a vulnerable adult, and that Anderson either unduly influenced him to transfer the funds or utilized her position of trust to take advantage of him while he was a vulnerable adult. Wiggins also alleged that "at all times complained of herein, . . . Sanders was in a constant state of confusion . . . and did not have the mental capacity to manage his money nor make cognizant decisions which were in his best interest." After filing the complaint, Wiggins sent Anderson requests for admissions. Anderson failed to respond to the requests, and the chancery court deemed them admitted. Wiggins then filed a motion for summary judgment.

¶4.    During the summary judgment hearing, Wiggins offered multiple exhibits into evidence, including an affidavit from neuropsychologist, Dr. Evans. Wiggins argued that the court should grant her motion because Anderson's admissions, the established facts, and Dr. Evans's affidavit proved that no genuine issue of material fact existed. The chancellor agreed and granted summary judgment, reasoning that the pleadings, answers to discovery and requests for admission, together with the affidavit of Dr. Evans showed no genuine issue of material fact.

¶5.    Anderson appealed, and we assigned the case to the Court of Appeals. Looking to the admissions, the established facts, and Dr. Evans's affidavit, the prevailing opinion of the

3

court reasoned that Wiggins had supported her conversion claim by arguing that Sanders was a vulnerable adult. *Anderson v. Wiggins*, No. 2017-CA-00607-COA, 2019 WL 2098392, at *5 (¶ 21) (Miss. Ct. App. May 14, 2019). *De facto* affirming the chancery court's decision by a 5-5 vote, the prevailing opinion wrote that Anderson's failure to respond to the motion for summary judgment meant she rested upon her allegations, and those were insufficient to show there was a genuine dispute of material fact. *Id.* at *6 (¶ 24).

¶6. Following the denial of Anderson's motion for rehearing, she filed a petition for *certiorari* review, and we granted it.

## STANDARD OF REVIEW

¶7. "We employ a *de novo* standard of review of a trial court's grant or denial of a summary judgment and examine all the evidentiary matters before it—admissions in pleadings, answers to interrogatories, depositions, affidavits, etc." *Foster v. Williams (In re Estate of Laughter)*, 23 So. 3d 1055, 1060 (¶ 17) (Miss. 2009) (quoting *Bullock v. Life Ins. Co.*, 872 So. 2d 658, 660 (¶ 6) (Miss. 2004)). "The evidence must be viewed in the light most favorable to the party against whom the motion has been made, and the moving party bears the burden of demonstrating that no genuine issue of material fact exists." *Moore v. Delta Reg'l Med. Ctr.*, 23 So. 3d 541, 544 (¶ 7) (Miss. Ct. App. 2009) (citing *Heigle v. Heigle*, 771 So. 2d 341, 345 (¶ 8) (Miss. 2000)). If there is no genuine issue of material fact, then "the moving party is entitled to judgment as a matter of law . . . ." *Heigle*, 771 So. 2d at 345 (¶ 8) (quoting *Miss. Dep't of Wildlife, Fisheries & Parks v. Miss. Wildlife Enf't Officers' Ass'n, Inc.*, 740 So. 2d 925, 930 (¶ 11) (Miss. 1999)). "On the other hand, '[i]f

4

there is doubt as to whether or not a fact issue exists, it should be resolved in favor of the non-moving party.'" ***Neely v. N. Miss. Med. Ctr., Inc.***, 996 So. 2d 726, 729 (¶ 11) (Miss. 2008) (quoting ***Aetna Cas. & Sur. Co. v. Berry***, 669 So. 2d 56, 70 (Miss. 1996) *overruled on other grounds by* ***Owen v. Miss. Farm Bureau Cas. Ins. Co.***, 910 So. 2d 1065 (Miss. 2005)).

## DISCUSSION

¶8.     Anderson's petition for writ of *certiorari* raises two issues.  First, Anderson argues that the chancery court erred by affirming the grant of summary judgment, and the Court of Appeals erred by failing to reverse.  Anderson also argues that Wiggins lacked evidence to prove that Sanders was a vulnerable adult.

¶9.     "[T]he threshold for summary judgment is high and requires that 'the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, . . . show that there is no genuine issue as to any material fact . . . .'" ***Stuckey v. The Provident Bank***, 912 So. 2d 859, 864 (Miss. 2005) (¶ 8) (quoting Miss. R. Civ. P. 56(c)). A fact is material if it "tends to resolve any of the issues properly raised by the parties." ***Ladnier v. Hester***, 98 So. 3d 1025, 1028 (¶ 10) (Miss. 2012) (internal quotation marks omitted) (quoting ***Moss v. Batesville Casket Co., Inc.***, 935 So. 2d 393, 398 (¶ 16) (Miss. 2006)).  "If *any triable facts exist*, the lower court's grant of a summary judgment *will be reversed*; otherwise the decision will be affirmed." ***Stuckey***, 912 So. 2d at 864 (¶ 8) (emphasis added) (internal quotation marks omitted) (quoting ***Miller v. Meeks***, 762 So. 2d

302, 304 (¶ 3) (Miss. 2000)).  Judge Tindell's dissent in **Anderson v. Wiggins** explained which party bears the burden of production and proof:

> In a summary[-]judgment hearing, the burden of producing evidence in support of, or in opposition to, the motion is a function of Mississippi rules regarding the burden of proof at trial on the issues in question.  The movant bears the burden of persuading the trial judge that: (1) no genuine issue of material fact exists, and (2) on the basis of the facts established, [s]he is entitled to [a] judgment as a matter of law.  The movant bears the burden of production if, at trial, [s]he would bear the burden of proof on the issue raised.

**Anderson**, 2019 WL 2098392, at *7 (¶ 34) (Tindell, J., dissenting) (quoting **Palmer v. Biloxi Reg'l Med. Ctr. Inc.**, 564 So. 2d 1346, 1355 (Miss. 1990)).  "[B]ecause [d]efendants do not carry any burden of production at trial, they also do not carry any burden of production at the summary-judgment stage."  **Karpinsky v. Am. Nat'l Ins. Co.**, 109 So. 3d 84, 89 (¶ 13) (Miss. 2013).

¶10.    In **Stuckey**, the court reviewed a sworn complaint to determine if it constituted evidence of triable issues of fact sufficient to defeat a motion for summary judgment.  **Stuckey**, 912 So. 2d at 864-65 (¶ 7).  Stuckey had responded to a motion for summary judgment with a sworn complaint, which contained a litany of allegations, after the moving party had met its burden of persuasion.  **Id.** at 866 (¶ 13).  Stuckey relied solely on the sworn complaint and argued it created a genuine issue of material fact.  **Id.**  Rejecting Stuckey's contention, the Court explained the provisions of Mississippi Rule of Civil Procedure 56(e) in the context of whether a response to a motion for summary judgment is necessary.  **Id.** at 867 (¶ 14).  The Court reasoned,

> The provisions of Rule 56(e) which caution practitioners that "they may not rest upon the mere allegations or denials of [their] pleadings," *clearly do not*

> *mandate a grant of summary judgment if there is no response to the summary judgment motion*; however, Rule 56(e) does caution that if the non-moving party fails to respond, summary judgment, *if appropriate*, shall be entered against [the non-moving party].

*Id.* at (¶ 15) (emphasis added).

¶11. Here, Wiggins bore the initial burden of establishing the nonexistence of issues of material fact when she moved for summary judgment on her conversion claim. Wiggins argued that Anderson's failure to provide evidence of a genuine issue of material fact entitled her to summary judgment as a matter of law.

¶12. "To establish a conversion, there must be proof of a *wrongful* possession, or the exercise of a dominion in exclusion or defiance of the owner's right, or of an unauthorized and injurious use, or of a wrongful detention after demand.'" *Evans v. Miss. Dep't of Human Servs.*, 36 So. 3d 463, 477 (¶ 59) (Miss. Ct. App. 2010) (emphasis added) (quoting *Cmty. Bank of Ellisville, Miss. v. Courtney*, 884 So. 2d 767, 772–73 (¶ 10) (Miss. 2004)). "[I]n order to maintain an action for conversion, there must have been, on the part of the defendant, some *unlawful* assumption of dominion over the personal property [of the plaintiff] . . . ." *Wilson v. Gen. Motors Acceptance Corp.*, 883 So. 2d 56, 69 (¶ 51) (Miss. 2004) (emphasis added) (quoting *First Inv'rs Corp. v. Rayner*, 738 So. 2d 228, 234–35 (¶ 27) (Miss. 1999)).

¶13. Here, the Court of Appeals focused on Wiggins's vulnerable adult argument when reviewing the chancery court's granting of summary judgment and explained that "at issue is whether Sanders qualifies as a vulnerable adult." *Anderson*, 2019 WL 2098392, at *5 (¶ 21). The Court of Appeals relied on Dr. Evans affidavit that explained that Sanders "did not

7

have the . . . mental capacity to realize he was transferring this large sum of money or any money to Chasity Anderson or the consequences of his actions . . . ." *Id.* at *5 (¶ 23). The Court of Appeals wrote that Anderson had more than sixty-eight days to respond to Wiggins motion for summary judgment and failed to do so. *Id.* at *5 (¶ 23). Affirming the decision of the chancery court, the Court of Appeals reasoned that "Anderson could not show that there was a genuine dispute of material fact." *Id.* at *5 (¶ 23). However, resting on mere allegations or failing to respond to a motion for summary judgment does not mandate granting the motion. *Stuckey*, 912 So. 2d at 864-65 (¶ 15); *see also* ***Dennis v. Searle***, 457 So. 2d 941, 947 (Miss. 1984) (overruling a grant of summary judgment, finding that the moving party failed to carry the required burden of establishing the nonexistence of genuine issues of material fact; despite [the] non-moving party's offering nothing to dispute the motion for summary judgment), *disagreed with on other grounds by* ***Thornhill v. Sys. Fuels, Inc.***, 523 So. 2d 983 (Miss. 1988)). Moreover, there is more than one genuine issue of material fact here.

¶14. While vulnerability may be one issue, it is not the only one. The vulnerable adult statute, Mississippi Code Section 11-7-165 (Rev. 2019), provides, in relevant part,

> In a civil action where it is *proven* that a *person took property* having a value of Two Hundred Fifty Dollars ($250.00) or more *belonging to a vulnerable adult* by *conversion*, embezzlement, extortion, theft or fraud without the owner's consent, or obtained the owner's consent by intimidation, deception, *undue influence* or by misusing a position of trust or a confidential relationship with the owner, then whether the action is to recover the property or damages in lieu thereof, or both, damages shall be recoverable up to three (3) times the amount of the monetary damages or value of the property embezzled, converted or otherwise stolen, in addition to any other damages.

8

Miss. Code. Ann. § 11-7-165(1)(a) (Rev. 2019) (emphasis added).

¶15. The plain language of the statute sets out the factual elements of Wiggins's claim. Those issues are whether Wiggins—as the moving party—proved that: (1) Anderson; (2) took property having a value of $250.00 or more (3) that belonged to Sanders, a vulnerable adult, by (4) conversion, undue influence or by utilizing her position of trust to take advantage of a vulnerable adult.

¶16. It is true that Wiggins supported her claim of conversion by producing evidence showing that Sanders qualified as a vulnerable adult. *Anderson*, 2019 WL 2098392, at *5 (¶21). Indeed, as the plain language of the Vulnerable Adult Statute reveals, individuals can make a complaint for conversion by proving that, among other things, an adult is vulnerable. Miss. Code Ann. § 11-7-165 (Rev. 2019). In support of her motion for summary judgment, Wiggins offered multiple exhibits:

Exhibit A: A copy of the complaint, which included copies of the following: (1) a July 25, 2014 check for $12,295 to J&J Auto Brokers signed by Sanders from his account; (2) a January 12, 2015 bank check for $100,072.73 to Anderson; (3) a January 23, 2015 bank check for $100,000 to Anderson; and (4) a Trustmark National Bank gift letter signed by Sanders acknowledging that Sanders was gifting $105,000 to Anderson for the purchase of property located at 112 Saint Charles Avenue, Florence, Mississippi 39073.

Exhibit B: A January 6, 2015 check for $500 to Remax Alliance signed by Anderson from her account.

Exhibit C: A MLS listing for a house for sale located at 112 Saint Charles Avenue, and the accompanying purchase contract executed on January 6, 2015, for the same house for a purchase price of $261,000.

9

Exhibit D:    A warranty deed to Anderson dated February 5, 2015, for the property at 112 Saint Charles Avenue.

Exhibit E:    A judgment deeming requests for admissions admitted.

Exhibit F:    Wiggins's first set of requests for admissions propounded to Anderson.

Exhibit G:    Dr. Evans's opinion and affidavit.

Exhibit H:    Anderson's answer to the complaint and affirmative defenses.

*Anderson*, 2019 WL 2098392, at *7 (¶ 36) (Tindell. J., dissenting).

¶17.    Of all the transfers made, the crux of Wiggins's complaint for conversion rests with three:

1.    On January 12, 2015, Sanders issued a check payable to Trustmark Bank in the amount of $100,072.73;

2.    A Trustmark National Bank gift letter signed by Sanders on January 22, 2015, acknowledged that he was gifting $105,000 to Anderson for the purchase of property located at 112 Saint Charles Avenue, Florence, Mississippi;

3.    January 23, 2015: a bank check for $100,000, payable to Anderson from Sanders account.

Wiggins averred that Anderson's admissions and Dr. Evans's opinion "remove[d] any question of there being a factual dispute to be rendered by this Court."

¶18.    We agree with Judge Tindell's dissent pertaining to Exhibits A through D. Judge Tindell explained that "Exhibits A through D only offer evidence of financial transactions made between or by Sanders and Anderson. . . . Sanders himself authorized the transactions . . . ." *Anderson*, 2019 WL 2098392, at *8 (¶ 37) (Tindell, J., dissenting). Indeed, a review

10

of the record reveals no evidence that Anderson exercised "dominion in exclusion or defiance of [Sanders's] rights." ***Evans v. Miss. Dep't of Human Servs.***, 36 So. 3d 463, 477 (¶ 59) (Miss. Ct. App. 2010) (internal quotation mark omitted) (quoting ***Cmty. Bank of Ellisville, Miss. v. Courtney***, 884 So. 2d 767, 772–73 (¶ 10) (Miss. 2004)). Additionally, there is no evidence in the record that Sanders demanded Anderson return the funds; therefore, there can be "no wrongful detention after demand." ***Id.*** (internal quotation mark omitted) (quoting ***Courtney***, 884 So. 2d at 772–73 (¶ 10)). Accordingly, as it pertains to her claim of conversion at the summary judgment hearing, Wiggins bore the burden of establishing Sanders's vulnerability *and* that Anderson *wrongfully* converted and possessed Sanders's funds by means of undue influence.

¶19. To raise a presumption of undue influence, the contestant must show "the existence of a confidential relationship between the testator and a beneficiary . . . , along with suspicious circumstances." ***Stover v. Davis***, 268 So. 3d 559, 563 (¶ 12) (Miss. 2019) (citing ***Croft v. Alder***, 237 Miss. 713, 723, 115 So. 2d 683, 686 (1959)). "Th[e] Court has held in numerous cases that the burden of establishing the existence of a confidential relationship is upon the party asserting it." ***West v. Johnson (In re Estate of Johnson)***, 237 So. 3d 698, 708 (¶ 27) (Miss. 2017) (internal quotation marks omitted) (quoting ***Norris v. Norris***, 498 So. 2d 809, 813 (Miss. 1986)). Several factors are considered when determining whether a confidential relationship exists:

> (1) whether one person has to be taken care of by others, (2) whether one person maintains a close relationship with another, (3) whether one person is provided transportation and has their medical care provided for by another, (4) whether one person maintains joint accounts with another, (5) whether one is

11

physically or mentally weak, (6) whether one is of advanced age or poor health, and (7) whether there exists a power of attorney between the one and another.

*Dabney v. Hataway (In re Estate of Dabney)*, 740 So. 2d 915, 919 (¶ 12) (Miss. 1999).

However, in another case, the Court explained,

A presumption of undue influence is not raised merely because a beneficiary occupies a confidential relationship with the testator; something more is required, such as active participation by the beneficiary in the procurement, preparation or execution of the will or mental infirmity of the testator.

In other words, there must be some showing that [the beneficiary] abused the relationship either by asserting dominance over the testator or by substituting her intent for that of [the testator].

*Gallaspy v. Gallaspy (In re Will of Wasson)*, 562 So. 2d 74, 78 (Miss. 1990) (quoting *Simm v. Adams (In re Will of Adams)*, 529 So. 2d 611, 615 (Miss. 1988)).

¶20. To prove her claim of conversion by undue influence, Wiggins relied on Anderson's admissions and the affidavit of Dr. Evans. As to the first element of a confidential relationship, Sanders undoubtedly needed care given to him by others. Importantly, Wiggins proclaimed that she "was the primary care giver[,] as she basically to moved to Jackson, Mississippi, in the fall of 2014 where she cared for and was present . . . for over three (3) months." Moreover, there is evidence of Sanders's deteriorating health. As it pertains to Anderson and Sanders's relationship, Wiggins's complaint explains that the two "reconnected online." The admissions do prove that the day Sanders signed the gift letter, Anderson's mother drove him from the hospital to Anderson's place of employment. However, the nature of that transaction and its circumstances are unknown. Additionally,

12

there is no proof that Anderson and Sanders shared a joint account or that a power of attorney for Sanders existed.

¶21. Weighing these factors raises doubt about whether there was a confidential relationship between Sanders and Anderson. Even assuming a confidential relationship exists, there is no proof in the record as to what extent, if any, Anderson participated in the procurement, preparation, or execution of the transfers. Accordingly, we hold that Wiggins failed to prove, at the summary judgment hearing, that Anderson *wrongfully* converted Sanders's funds by means of undue influence.

¶22. Anderson's second argument is that there is a lack of evidence as to whether Sanders qualified as a vulnerable adult. Like her conversion argument, Wiggins relied on Anderson's admissions and Dr. Evans's affidavit to support her contention that Sanders was a vulnerable adult and lacked the mental capacity necessary to understand the transfers he made. Wiggins also argued that Anderson took advantage of her position of trust with Anderson when he was vulnerable. Wiggins averred that Sanders "was in a constant state of confusion and did not have the mental capacity to manage his money nor make cognizant decisions which were in his best interest." Mississippi Code Section 43-47-5(q) (Rev. 2015) defines a "vulnerable person" as

> [A] person, whether a minor or adult, whose ability to perform the normal activities of daily living or to provide for his or her own care or protection from abuse, neglect, exploitation or improper sexual contact is impaired due to a mental, emotional, physical or developmental disability or dysfunction, or brain damage or the infirmities of aging.

Miss. Code Ann § 43-47-5(q) (Rev. 2015).

13

¶23.	Assuming Sanders is a vulnerable adult "does not mean that the individual is incompetent to transfer his or her assets to another." *Anderson*, 2019 WL 2098392, at *9 (¶ 41) (Tindell, J., dissenting). Incapacity requires a showing that the person either "(1) did not understand the legal consequences of his actions; (2) suffered from a general 'weakness of intellect' with either inadequate consideration given for the transfer, or a confidential relationship; or (3) suffered from permanent insanity up to and after the date of execution." *Van Quinn v. Quinn*, 278 So. 3d 1160, 1166 (¶ 23) (Miss. Ct. App. 2019) (quoting *Smith v. Smith*, 574 So. 2d 644, 653-54 (Miss. 1990)). Except for permanent insanity, the critical time for determining capacity is the transfer date. *Smith*, 574 So. 2d at 653.

¶24.	In *In re Estate of Laughter*, the Court sought to determine whether a testator had testamentary capacity to make an *inter vivos* gift to his wife. *In re Estate of Laughter*, 23 So. 3d at 1061 (¶ 18). The court explained that "[t]he mere fact that someone is too ill to handle his affairs does not in and of itself render him mentally incompetent or void of testamentary capacity." *Id.* at (¶ 22). "Th[e] Court recognize[d] that mental incapacity or insanity, 'is not always permanent, and a person may have lucid moments or intervals when that person possesses necessary capacity to convey property.'" *Whitworth v. Kines*, 604 So. 2d 225, 229 (Miss. 1992) (quoting *Smith*, 574 So. 2d at 653). "[T]he testator must be of 'sound and disposing mind' at the time of . . . execution." *Noblin v. Burgess*, 54 So. 3d 282, 291 (¶ 32) (Miss. Ct. App. 2010) (quoting Miss. Code Ann. § 91-5-1 (Rev. 2004)). "The requirement of a sound and disposing mind does not mean the testator's mind must be as good as it ever was." *Noblin*, 54 So. 3d at 291 (¶ 32).

14

¶25.    In *Edwards v. Edwards (In re Estate of Edwards)*, 520 So. 2d 1370 (Miss. 1988), the

Court considered similar facts.  On September 30, 1982, Jimmie Edwards, the testator, and

his son, Jerry, drove to their lawyer's firm to draw up a new will.  *Id.* at 1371.  Jimmie

created the will and he and Jerry proceeded to the bank where two individuals witnessed the

will's execution.  *Id.* at 1371-72.  After Jimmie's death, Loree, Jimmie's wife, contested the

validity of the will, arguing undue influence and a lack of testamentary capacity.  *Id.*  Loree

relied on the testimony of Jimmie's doctors, who were not present during the will's execution

on September 30, 1982.  *Id.*  The doctors testified that, based on their previous examinations,

Jimmie's mental capacity would have been substantially impaired by the date Jimmie

executed the will due to previous "chronic mental problems."  *Id.*    However, the two

witnesses that personally observed Jimmie's execution of the will testified that they found

Jimmie "sane and sober," explaining that they "noticed nothing unusual" about the testator.

*Id.*

¶26.    Though the chancery court found no undue influence, the *Edwards* Court reversed the

court's finding that Jimmie lacked the requisite testamentary capacity.  *Id.* at 1373.    The

*Edwards* Court explained that capacity "is to be tested as of the date of execution of the

will."  *In re Estate of Edwards*, 520 So. 2d 1370, 1372 (Miss. 1988) (internal quotation

marks omitted) (quoting *Scally v. Wardlaw*, 123 Miss. 857, 878, 86 So. 625, 626 (1920)).

The Court noted that the chancellor leaned heavily on the testimony of the doctors whose

most recent examination of Jimmie had occurred more than one year before.  *In re Estate of*

*Edwards*, 520 So. 2d  at 1373.  The Court explained that

[W]hether Jimmie D. Edwards possessed testamentary capacity when attended by his physicians months before the will's execution, is irrelevant to the issue before us; rather, we are concerned with his testamentary capacity on September 30, 1982. Recognizing that a testator may not always possess testamentary capacity, we have held that he may nevertheless execute a valid will during a lucid interval.

*Id.* (citing *Lee v. Lee*, 337 So. 2d 713, 715 (Miss. 1976); *Gholson v. Peters*, 180 Miss. 256, 267, 176 So. 605, 606 (1937); *Lum v. Lasch*, 93 Miss. 81, 87, 46 So. 559 (1908)).

¶27. Here, Wiggins argues that Dr. Evans's opinion supports a finding that Sanders lacked the requisite capacity to transfer his assets. Dr. Evans is a neuropsychologist at Methodist in Jackson, Mississippi, and was a part of a team that treated Sander the fourteen days he was there. Sanders's treatment dates ranged from November 14, 2014, to November 28, 2014. While at Methodist, Dr. Evans observed Sanders's "aberrant behavior and neurological seizures." She also opined that Sanders was on multiple medications, some of which could have affected his mental capacity and cognitive deficits. Dr. Evans opined that "at the time of discharge from Methodist, Sanders was weak, ill and had cognitive impairments which classified him as a vulnerable adult under the laws of the State of Mississippi."

¶28. When it came to formulating a medical opinion regarding Sanders's mental capacity at the time of the January 2015 transfers, Dr. Evans referenced her previous interactions with Sanders and medical notes taken by a speech pathologist during Sanders's outpatient-rehabilitation services. The outpatient services continued from December of 2014 through January of 2015. Looking to the January 12, 2015 transfer, Dr. Evans relied upon a review of the therapist's notes taken on January 13, 2015, which stated that Sanders was "having trouble remembering to take his medications." Dr. Evans opined, to a reasonable degree of

16

neuropsychological/medical probability, that Sanders did not have the cognitive ability or mental capacity to realize he was transferring large sums of money. As for the January 22, 2015 transactions, it appears that Dr. Evans relied on the therapist's notes taken four days earlier to reach the same conclusion. However, Dr. Evans opined she reviewed notes taken by the speech pathologist on the same day that Sanders signed the gift letter. The therapist's notes explained that "[Sanders] showed delays in speed of processing and needed assistance (cues) when working on executive functioning exercises with regard to reasoning and problem solving."

¶29. Nowhere in Dr. Evans's affidavit does she state that Sanders was incompetent or insane. Because Dr. Evans did not claim that Sanders was incompetent or insane, we need not concern ourselves with Sanders's capacity when attended by his physicians months or even days before he made the transfers. Therefore, the critical date for determining Sanders's capacity to transfer his funds is the transfer dates. *Smith v. Smith*, 574 So. 2d 644, 653 (Miss. 1990) (explaining that the critical time for determining the capacity of someone who suffers from a weakness of intellect or great weakness of mind is the date of execution). Accordingly, there must be a showing that Sanders either "did not understand the legal consequences of his actions" or that he "suffered from a 'general weakness of intellect' [and had] a *confidential relationship*" with Anderson. *Van Quinn*, 278 So. 3d at 1166 (¶ 23) (quoting *Smith*, 574 So. 2d at 653-54).

¶30. Taking Dr. Evans's affidavit as true and assuming Dr. Evans did review notes taken on the same day that Sanders signed the gift letter does not necessarily mean that he was

17

unable to understand the legal consequence of his actions. The record contains no evidence of the level of difficulty as it pertains to the "executive functioning exercises" that Sanders supposedly performed on the day he signed his gift letter. In fact, there is no proof that these exercises pertained to Sanders testamentary capacity. Moreover, even if these exercises prove that Sanders suffered from a general "weakness of intellect," Anderson's admissions do not establish a confidential relationship. Though Dr. Evans's opinion provides a plethora of persuasive facts, it, at most, establishes that Sanders may have qualified as a vulnerable adult the day of the transfers. However, it is unclear that Dr. Evans properly understood the legal term "testamentary capacity."

¶31. At its core, the case *sub judice* arose from a conversion claim. Assuming Sanders qualified as a vulnerable adult does not prove that Anderson wrongfully obtained Sanders's funds by means of undue influence. Of the three main transfers made, we only know that Anderson's mother drove Sanders to Anderson's place of employment to sign the gift letter. We know nothing of the surrounding facts and circumstances as it pertains to the other transfers made.

¶32. The Court of Appeals opinions both make reasonable arguments. However, genuine issues of material fact remain unresolved. "If there is doubt as to whether or not a fact issue exists, it should be resolved in favor of the nonmoving party." *Neely*, 996 So. 2d at 729 (¶ 11). Here, doubt remains as to whether Anderson wrongfully converted Sanders's funds.

## CONCLUSION

18

¶33. The Chancery Court erred by granting the motion for summary judgment. Viewing the evidence in the light most favorable to the nonmoving party leaves genuine issues of material fact unresolved. Accordingly, the Court reverses the judgments of the Rankin County Chancery Court and of the Court of Appeals and remands the case to the chancery court for further proceedings.

¶34. **REVERSED AND REMANDED.**

**RANDOLPH, C.J., KITCHENS AND KING, P.JJ., MAXWELL, BEAM, CHAMBERLIN, ISHEE AND GRIFFIS, JJ., CONCUR.**