# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-CA-01131-COA

ESTATE OF BESSIE LEAN BROWN ANDERSON, DECEASED: MELVIN BROWN AND HELEN E. BROWN     APPELLANTS

v.

RONALD FITZGERALD II     APPELLEE

DATE OF JUDGMENT: 06/06/2023
TRIAL JUDGE: HON. GEORGE WARD
COURT FROM WHICH APPEALED: ADAMS COUNTY CHANCERY COURT
ATTORNEYS FOR APPELLANTS: GLENN GATES TAYLOR
IAN AUSTIN
ATTORNEYS FOR APPELLEE: GERALD ALEXANDER MUMFORD
SAMMY LEE BROWN JR.
NATURE OF THE CASE: CIVIL - WILLS, TRUSTS, AND ESTATES
DISPOSITION: AFFIRMED - 05/06/2025
MOTION FOR REHEARING FILED:

**BEFORE WILSON, P.J., LAWRENCE AND EMFINGER, JJ.**

**WILSON, P.J., FOR THE COURT:**

¶1. In 1997, Harvey and Bessie Anderson, husband and wife, executed reciprocal wills that devised their jointly owned home to one another and then to their godson, Ronald Fitzgerald II, upon the death of the surviving spouse. In 2015, Harvey died. In 2017, Bessie executed a deed conveying the home to her brother Melvin Brown and Melvin's wife, Helen. Bessie continued to live in the home until she died in 2021.

¶2. After Bessie's will was accepted for probate, Ronald filed a motion to set aside the deed to Melvin and Helen, alleging that it was procured by undue influence and that Bessie lacked capacity or suffered from a weakness of intellect. Following a bench trial, the

chancellor found that Bessie suffered from a weakness of intellect when she signed the deed, that the consideration for the deed was grossly inadequate, that there was a confidential relationship between Bessie and Melvin, and that Melvin failed to rebut the presumption of undue influence. Therefore, the chancellor set aside the deed and ordered the property to be conveyed to Ronald pursuant to Bessie's will.

¶3.     On appeal, Melvin[1] argues that the chancellor clearly erred by finding (1) that Bessie suffered from a weakness of intellect, (2) that he gave grossly inadequate consideration for Bessie's home, (3) that he and Bessie were in a confidential relationship, and (4) that he failed to rebut the presumption of undue influence. However, substantial evidence supports the chancellor's findings that Bessie suffered from a weakness of intellect and that the consideration for the deed was grossly inadequate. Because those findings are sufficient to require the deed to be set aside, we affirm the judgment without addressing Melvin's remaining issues on appeal.

## FACTS AND PROCEDURAL HISTORY

¶4.     Bessie and Harvey Anderson were married for decades and moved to Natchez sometime in the 1990s. No children were born of their marriage. In 1997, Bessie and Harvey executed reciprocal wills that left all their property to each other. Both wills also provided that if the testator's spouse predeceased the testator, then their home and its contents would go to their godson, Ronald Fitzgerald II. Bessie and Harvey had helped raise

---

[1] The deed conveyed the subject property to Melvin and Helen as joint tenants with rights of survivorship, and both Melvin and Helen are parties and appellants. However, for ease of reference, we refer to the appellants as "Melvin."

Ronald before he and his mother, Shirley Fitzgerald,[2] moved to Los Angeles in the mid-1980s when Ronald was five years old. Until Bessie died, photographs of Ronald were prominently displayed in her home.[3]

¶5. After Harvey became ill and passed away in 2015, family members began noticing a decline in Bessie's physical and mental health. From July 2015 to May 2017, Bessie saw physicians approximately fifteen times for issues including severe back pain caused by degenerative lumbar disc disease, chronic depression, anxiety, insomnia, hypertension, high cholesterol, and arthritis. Bessie was taking numerous prescription medicines, including but not limited to Hydrocodone, Alprazolam, Escitalopram, and Temazepam.

¶6. On May 11, 2017, Bessie went to the emergency room at Merit Health in Natchez. She was experiencing "dizziness," "altered mental status," "vision changes," and intense headaches. She was discharged the same day with instructions to return if her symptoms worsened. Bessie returned to the emergency room two days later, stating that she felt "drunk and dizzy." She was diagnosed with vertigo and again discharged with instructions to return if her condition worsened.

¶7. The following day, May 14, 2017, Bessie was taken to the emergency room by ambulance. The ambulance service's records show that a family member stated that when they checked on Bessie, they found her sitting in a chair in her home. Her confusion had

[2] Shirley was Harvey and Bessie's niece. Her father was Harvey's brother.

[3] Although several friends and family members testified that photos of Ronald were prominently displayed in Bessie's home, Melvin claimed that he did not know Ronald and had never seen a photo of him.

increased, and she was dizzy and unable to comprehend how to open the door. The admitting physician at the hospital diagnosed her with "altered mental status" and "dementia."

¶8. The hospital's discharge planning summary for Bessie shows that on May 15, Bessie stated that she planned to return home and believed she could take care of herself without assistance. However, her case manager found that Bessie was "not an accurate historian" and had "dementia." The case manager determined that a discharge home was "no longer a safe [discharge] for [Bessie]." Bessie's medical records describe her as "more lucid" on May 17 and state that she had agreed to be discharged to a skilled nursing facility. Bessie's discharge summary shows that Bessie was discharged on May 17. The discharging physician noted that her "mental status [was] back to baseline and she [was] fully lucid and alert." Her final diagnosis was "[a]ltered mental status, likely secondary to inappropriate use of benzodiazepines and opiates." The record from Bessie's next visit to her primary care physician (on June 26, 2017) states that she had been "hospitalized for almost a month," presumably at the skilled nursing facility, for "acute kidney failure secondary to overdosage of opioids and [benzodiazepines]."

¶9. Bessie's brother Melvin, who lived in Minnesota, testified that around this same time, he was discussing "future stuff" with Bessie.[4] He testified that during a July 2017 telephone call, Bessie said that she wanted to convey her home to him because she was worried it would "go to the State" if she had to move into a nursing home. At trial, Melvin

---

[4] Bessie had seven siblings. Four of her siblings were still alive in 2017, and she was survived by three siblings, including Melvin. None of her other siblings testified at trial.

4

acknowledged that Bessie's home was worth approximately $180,000.[5]

¶10.    On August 9, 2017, Melvin contacted Natchez attorney Tim Blalock, whose firm had drafted Bessie's will in 1997.  Melvin asked Blalock to prepare a deed conveying Bessie's home to Melvin, a power of attorney naming Melvin as Bessie's attorney-in-fact, and an advance health care directive for Bessie.  In August 2017, Melvin also became a joint owner of Bessie's checking account.  In October 2017, Blalock sent Melvin drafts of the documents he had requested.  Because Melvin was in Minnesota and Bessie was "homebound," Blalock offered to go to Bessie's home to go over the documents with her.  However, Melvin told Blalock that he would meet with Bessie himself.  Melvin testified that he needed to "sit down with" Bessie and "have [a] conversation" with her before they "move[d] forward."

¶11.    On November 30, 2017, Melvin took Bessie to Regions Bank, and in the presence of a notary public, Danielle Eubanks, Bessie signed three documents: a deed conveying her home to Melvin, a power of attorney naming Melvin as her attorney-in-fact, and an advance healthcare directive.  In an affidavit attached to the advance healthcare directive, Eubanks "declare[d] under the penalty of perjury that [Bessie] appear[ed] to be of sound mind and under no duress, fraud or undue influence."  At trial in 2023, Eubanks could not specifically remember Bessie, but she testified that she would not notarize a document if the signatory appeared to be of unsound mind.  Eubanks acknowledged that she might not be able to perceive that a person had dementia.

¶12.    In late 2017 and early 2018, Bessie became increasingly forgetful and eventually

---

[5] Melvin had insured the dwelling and other structures on the property for $289,740.

required full-time care. Her niece Kathy Richards[6] moved in with her to help care for her. On October 16, 2018, a doctor formally diagnosed Bessie with dementia and prescribed medication for dementia. The doctor noted that Bessie's "recent memory" was "abnormal" and that Bessie "was not able to recall any of the [three simple] words" the doctor had asked her to remember. Bessie died on April 26, 2021.

¶13.    After Bessie's death, Kathy began cleaning out Bessie's house for Melvin to sell. In the process, Kathy found Bessie's will. Kathy told Shirley (Ronald's mother) and Melvin about the will, and both were surprised to learn of its existence. In December 2021, Shirley filed a petition to probate Bessie's will. The court accepted the will for probate and appointed Shirley as the administrator of Bessie's estate.[7] Melvin filed a motion to dismiss the proceeding on the ground that Shirley had no interest in the estate. In the alternative, Melvin moved to remove Shirley as executor. The chancellor denied Melvin's motion to dismiss, reasoning that although Shirley had no interest in the estate, Ronald could ratify and join the petition to probate. The chancellor also removed Shirley as executor and appointed the chancery clerk to serve as administrator.

¶14.    At trial, Kathy testified that she regularly visited Bessie and Harvey and that Ronald's "baby pictures" had been "prominently displayed" in their home for as long as she could remember. Kathy testified that after Harvey died in 2015, several family members took turns

---

[6] Kathy's father, Joe Anderson, was Harvey's brother.

[7] The will named Harvey to serve as executor or, in the alternative, Harvey's brother Joe Anderson. Joe had also predeceased Bessie. Joe was Shirley's uncle. Melvin testified that he had "heard [Joe's] name" but did not know him.

checking on Bessie. Kathy testified that Bessie had always been "a very prideful woman about the way she did her hair" and "the way she dressed," but after Harvey became ill, she "noticed a total difference in the way that [Bessie] carried herself." Kathy stated that Bessie seemed to have "things going on mentally and physically" and "needed somebody to be there with her," especially when Harvey was sick. Kathy testified that in 2015, Bessie began complaining about physical pain in her legs and back. Kathy testified that around the same time, Bessie began "constantly setting the alarm off" when she returned to her house, and a relative "would have to come and turn the alarm off."

¶15. Kathy testified that Bessie was also having trouble concentrating and experienced "a lot of confusion . . . taking care of simple things." After Harvey's death, Bessie asked Kathy to help her write thank-you notes because Bessie "couldn't concentrate." Kathy testified that Bessie also had difficulty remembering whether she had paid her bills and keeping up with her appointments. Bessie also had issues "managing her medicines" and occasionally took "too much of a particular medicine." During this period, Bessie appears to have been taking between ten and fifteen different prescription medicines at any given time. Other relatives were also checking in on Bessie regularly to try to help her and to monitor her use of various prescriptions. Kathy testified that Bessie's house was in "disarray" with "papers and stuff everywhere," and the floors were "really, really, dirty." Kathy found this environment "very abnormal" for Bessie.

¶16. It eventually became clear that Bessie needed full-time care, so after "many conversations" with Melvin, Kathy moved in with Bessie in mid-2018. Kathy's

7

responsibilities as Bessie's full-time caretaker included taking her to appointments, housekeeping, and assisting with Bessie's personal "upkeep and her daily routines." Bessie's medication management improved after Kathy moved in. However, Bessie became increasingly forgetful. Kathy stated that Bessie would "get in the car, and would go and come back, and go and come back," and it became clear Bessie needed to stop driving. Kathy called Melvin "quite a bit about [her] concerns about Bessie." Melvin came to visit Bessie "three or four times." Less than two weeks after Bessie's death in April 2021, Melvin listed her house for sale. Kathy first learned that Melvin owned the home when he listed it for sale. She was surprised to learn that he had owned the home since 2017. While Kathy was cleaning the house in preparation for sale, she found Bessie's will.

¶17. Brandy Frye also testified at trial. Brandy's grandmother, who passed away in 2017, was Harvey's sister. Both Brandy and her grandmother were very close to Bessie, and in 2017, Brandy visited Bessie "two or three times a week." Brandy testified that in 2017, there were times when Bessie "would have altered mental status" and "would call [Brandy] to come get her" because she "wouldn't be quite sure where she was." She "would call [Brandy] to come get her," but as soon as she went with Brandy to Brandy's house, "she wouldn't know why she was down there" and would want to go home. According to Brandy, she "would fuss" and ask "to go home" and say she did not "know why y'all brought me down here." At times, Bessie could not "remember if she took her medicines or not" and would try to "double take them." Other times, Bessie would call the paramedics to go to the hospital, but she "wouldn't want to go when they came."

¶18. Brandy testified that after Harvey passed away, Bessie's house became disorganized and unclean. Bessie would allow clothes and dishes to pile up. This was a "big difference" because Bessie had always "kept a clean house" in the past. Brandy, too, had no idea that Bessie had conveyed her house to Melvin in 2017.

¶19. Bessie's niece Mary Frye also testified. Mary testified that Bessie had back pain, knee issues, and high blood pressure. Mary did not recall Bessie having any sort of "mind problems" before 2017, but Mary testified that in 2017, Bessie's "mind [was] kind of gone." Mary first noticed that Bessie started missing church, which was out of character because Bessie had always faithfully attended church. In addition, Bessie began forgetting things. Bessie would call Brandy to come get her but then say "she was ready to go back home" as soon as they got to Brandy's house. Then, after Brandy took Bessie back home, Bessie would call Brandy to come pick her up all over again. Bessie would also ask for medicines she had already taken. Sometime in 2017, Mary told Melvin that "Bessie need[ed] some help." Mary only talked to Melvin once on the phone. Mary did not know whether Bessie paid her own bills in 2017, but she testified that Melvin "took over before Kathy moved in." Mary also did not know Melvin owned the home until after Bessie passed away.

¶20. Shirley Fitzgerald grew up in Natchez but had lived in Texas for most of her adult life. As a child, Shirley was very close to Bessie and Harvey, her aunt and uncle. After Harvey died, Shirley came to Natchez to visit Bessie about once a month. During these visits, she began noticing that Bessie was "forgetting things." Shirley was not present for any conversations between Bessie and Melvin about the house. Bessie told Shirley that she

9

"wanted to give Ronald something," but Shirley did not know that Ronald was a beneficiary of Bessie's and Harvey's wills until Kathy found Bessie's will after Bessie died. Shirley also did not know that Melvin owned Bessie's house until after Bessie died.

¶21. Ronald testified that although he moved away from Mississippi when he was young, he had good memories of "a loving relationship" with his godparents, Bessie and Harvey. After his family moved, Ronald visited Bessie and Harvey occasionally, but as time passed, he did not see or talk to them as much. He did not attend Harvey's funeral, and between 2015 and 2021, he talked to Bessie only sporadically. Ronald did not know he was a beneficiary of Bessie's will until he returned to Natchez for her funeral. When he met Melvin at the funeral, Melvin said he would be in touch with Ronald at a later date.

¶22. Attorney Tim Blalock testified at trial. Blalock's father had been a lawyer in the same law firm and had done legal work for Bessie and Harvey, including drafting their wills in 1997. Around October 2017, Blalock had at least one phone call with Bessie during which she expressed her desire for Melvin to have her house. Blalock testified that Bessie "wanted to keep [the house] in the family" and said that Melvin "would be able to take care of the property." Blalock stated his brief conversation with Bessie "satisfied [his] curiosity about whether she knew what she was doing." He offered to draft a deed for her to sign, but Bessie told him she was "kind of homebound." Blalock believed that he represented both Melvin and Bessie because "they were both in agreement" on the transaction. Blalock testified that although his father had prepared Bessie and Harvey's 1997 wills, he was not aware of the wills when he prepared the deed for Bessie's house.

10

¶23.    Sylvester Harris, a local roofer, replaced Bessie's roof in February 2018. He testified that Bessie picked out the shingles and "sounded good" when they discussed the project. Harris testified that Melvin first contacted him about the roof, and he acknowledged that his interaction with Bessie was brief, lasting only five or ten minutes.

¶24.    Willie Pree, Bessie's longtime neighbor, testified that he and his wife were close friends with Bessie and Harvey for years. Pree remained close to Bessie after Harvey died, and from 2015 to 2017 he interacted with Bessie "at least every other day." Pree testified that after Bessie returned home from the hospital in the summer of 2017, she continued to live on her own and take care of herself. Bessie told Pree that she was going to "let her brother have the house and stuff." Pree had only limited opportunities to observe Bessie and Melvin together, but he stated that Melvin was "a wonderful guy." Pree did not notice Bessie's mental capabilities declining. Pree knew that Ronald was Bessie's godson and remembered seeing Ronald's photos displayed in Bessie's home. Pree acknowledged that Melvin had written him (Pree) several checks and testified that the checks were to reimburse him for expenses he had incurred and work he had done for Bessie.

¶25.    Cane Callon had known Bessie and Harvey for most of his life. Around May 2017, Bessie asked Callon if he could loan her $2,500 to "help her pay some bills." Callon loaned her the money and accepted a deed of trust on her home as security. Around August 2017, Bessie asked Callon if he would accept Harvey's 2001 Ford F-150 truck in lieu of repayment. Callon agreed and accepted the truck as full repayment of Bessie's debt. Around May 2018, Melvin contacted Callon after realizing that Callon had a deed of trust on Bessie's home.

11

Callon explained that Bessie's debt was paid and that he had forgotten to cancel the deed of trust. Callon then cancelled the deed of trust. When talking to Bessie about the loan and repayment, Callon never sensed that she was having any mental difficulties.

¶26. Melvin testified that Bessie and Harvey paid his tuition for his first year at Alcorn State University. After graduating from college, Melvin worked briefly in Vicksburg before taking a job with the Internal Revenue Service and relocating to Minnesota in 1973. Melvin retired from the IRS after thirty-two years. Melvin testified that after he moved to Minnesota, he remained "close" to Bessie even though he only saw her once or twice a year. Melvin testified that he "was not aware of Bessie's multiple hospital visits" and only knew about one hospitalization.

¶27. Melvin testified that during a phone conversation around July 4, 2017, Bessie said she was "going to transfer" her house to him. According to Melvin, Bessie said she also wanted him "to be power of attorney for [her] affairs because [she was] getting old" and wanted an advanced healthcare directive. Melvin testified that Bessie wanted to convey the house to him because she was concerned that if she had to go to a nursing home, the State would take her home to pay her nursing home bills. Melvin testified that he and Bessie had "several conversations" about her wishes. Melvin told Bessie that he would contact a lawyer, and Bessie told him to call Blalock, whose firm she and Harvey had used in the past. Melvin did not know that Blalock's father had drafted Bessie and Harvey's wills in 1997.

¶28. In August 2017, Melvin visited with Bessie in Mississippi, and Melvin testified that they continued to talk about "future stuff." Melvin testified that he and Bessie went to

12

Regions Bank, and Bessie introduced him to a bank employee. According to Melvin, Bessie told the employee that she planned to sign a power of attorney in favor of Melvin, but the employee encouraged her to instead make Melvin a joint owner of her checking account because "some people here don't understand the power of attorney." Melvin testified that Bessie agreed and added Melvin as a joint owner of her checking account. Melvin stated he did not use any of Bessie's funds prior to November 30, 2017.

¶29. Around August 9, 2017, Melvin contacted Blalock via email and asked him to draft a warranty deed conveying Bessie's home to him. Melvin asked Blalock to perform a title search, inform him of any liens or encumbrances, and provide "a written title opinion."[8] Melvin also instructed that the deed from Bessie to him should "be a clear transfer of title [with] no life [e]state retained." At trial, Melvin testified that there was "no need" for a life estate because Bessie trusted him. A few weeks later, Melvin asked Blalock to prepare a power of attorney and advance healthcare directive authorizing Melvin to act on Bessie's behalf. Melvin testified that Blalock was his attorney but that he (Melvin) was simply carrying out Bessie's wishes. In October 2017, Blalock sent Melvin a draft deed, and Melvin requested edits. On November 3, 2017, Blalock offered to "go out [to Bessie's house] and get the deed signed." But Melvin told Blalock that he would come to Mississippi and take the deed to Bessie himself because he wanted to have "a long conversation" with Bessie before she signed the deed.

_____

[8] Initially, Melvin also asked Blalock to prepare documents that would require him to pay Bessie "rent" for her home in the amount of $400 or $500 per month. Melvin testified that he did so because he assumed Bessie might need the money, but Bessie later told him that she did not need him to pay her.

¶30. Melvin testified that he emailed Blalock shortly after, requesting an updated deed, but Blalock did not respond. Melvin had a "short timeline" in mind for the transaction, so he contacted another attorney, Glen Taylor, to finalize the deed. At Melvin's request, Taylor deleted a sentence related to mineral rights from Blalock's draft, but he left Blalock's name on the deed as the person who prepared it.

¶31. Melvin admitted that he had a "short timeline" to have Bessie sign the documents because of "family issues" and "snow." But he testified that he still wanted to talk to Bessie in person to confirm that she wanted to execute the deed. On November 29, 2017, Melvin went to Bessie's house with a warranty deed conveying her home to him, a power of attorney designating him as her attorney-in-fact, and an advance medical directive. No one else was present. Melvin testified Bessie told him that she wanted him to have the house and did not want her other siblings to get it. Melvin testified that Bessie knew he "wasn't going to keep" the house and planned to sell it after she died.[9] According to Melvin, Bessie said that she wanted Melvin "to give [her godson] a little something" after he sold the house, but she left it to Melvin to decide how much to give him. Melvin stated that he did not know Bessie had a godson and had never seen Ronald's photo in her home. According to Melvin, Bessie said, "I trust you with my money and only you. . . . Because my sisters, everybody wanted some of my money." The next day, November 30, 2017, Melvin drove Bessie to Regions Bank,

---

[9] In contrast, Blalock testified that Bessie told him that she "want[ed] to keep [her house] in the family" and "believed [Melvin] would be the right person to take care of it."

where she signed each document in the presence of a notary public.[10]

¶32.    Melvin testified that in May 2018, Mary Frye called him and said that Bessie was "having a mental problem" and "needed somebody" to stay with her. Mary told him, "Bessie is having some real problems now. She needs some help. She needs somebody in there." Mary suggested Kathy might be able to move in with Bessie and help care for her. Melvin then contacted Kathy and arranged for her to move in with Bessie. Melvin testified that in exchange for living in the house, Kathy agreed to pay him for the utilities. Melvin testified that Willie Pree and his wife also called him around the same time and expressed concerns about Bessie. They said Bessie "needed help" and "to have somebody in the house" with her because "she was having some mental problems" and "had really turned bad for the worse." Melvin acknowledged Bessie had "some mental problems" in May 2018, but he testified that he did not know whether those problems existed in 2017. Melvin testified, "I think I remember [Bessie] having some physical problems [in 2017]. But I'm not sure what they were at this time because I wasn't really focused on it." Bessie was diagnosed with dementia in October 2018.

¶33.    Bessie's income consisted of Harvey's pension and Social Security payments. Sometime in 2018, Melvin noticed that Bessie had repeatedly overdrawn from her bank account. Melvin decided to open a new joint checking account to pay her bills because "she wasn't capable" of doing so. As a joint owner of Bessie's existing checking and savings

_____

[10] As noted above, the notary testified that she had no particular memory of Bessie or the notarized documents; however, the notary testified that she would not have notarized the documents if she suspected that Bessie lacked capacity or was under undue influence.

15

accounts, he transferred funds to the new account. He deposited funds he received from Kathy for utilities in the new account. Melvin made Bessie a joint owner of the new account but did not give her signing authority. However, Melvin testified that problems continued because the tellers at the bank knew Bessie and allowed her to continue to withdraw funds. Melvin testified he never transferred any of Bessie's funds out of her account prior to November 30, 2017. In total, Melvin jointly owned three bank accounts with Bessie; he testified that he used the accounts solely "for her needs."

¶34. Melvin testified that he never knew that Bessie had a will. He testified that the topic "came up in conversation," and when he specifically asked her whether she had a will, Bessie just said, "Don't you worry about that. I know how to handle that." Melvin said he just "dropped it" and "had no concern about it no more."

¶35. Melvin acknowledged he did not pay Bessie any money for her house, but he testified that other promises and payments he made were consideration for the house. Melvin testified that he gave Bessie "reassurance" that "she would be able to live in the house for the rest of her life," that he "would pay her medical bills in the event she couldn't pay them," and that he "would be guarantor of any debts that she owed." Melvin acknowledged that except for a $944 bill for a brief stay at a nursing facility, he did not actually use his own funds to pay any of Bessie's medical bills. Melvin testified that he also agreed to pay the insurance and taxes on the property and promised Bessie that he would keep her house from going to "the State." Melvin testified that he paid $944 for Bessie's nursing home care, $11,077 for property taxes, $5,686 for insurance, and $10,033 for Bessie's funeral expenses. Melvin also

16

reimbursed himself from Bessie's accounts for certain expenses he incurred traveling between Minnesota and Mississippi prior to her death. After Bessie died, Melvin transferred funds from her bank accounts to his Minnesota account. Melvin then distributed those funds to Bessie's other siblings or their heirs as he saw fit.

¶36. As stated above, after Bessie died in April 2021, Kathy found Bessie's will while cleaning out Bessie's house. In December 2021, Shirley filed a petition to probate the will. The court accepted the will for probate and appointed Shirley as the executor of Bessie's estate. However, the chancellor later removed Shirley as executor and appointed the chancery clerk to serve as administrator. Ronald filed a motion to set aside the deed from Bessie to Melvin, alleging that Bessie lacked capacity or suffered from a weakness of intellect, that there was inadequate consideration for the deed, and that Melvin procured the deed by undue influence. The case proceeded to a bench trial in April 2023.

¶37. Following the trial, the chancellor entered a final judgment finding that Bessie suffered from weakness of intellect, that the consideration for Bessie's home was grossly inadequate, that a confidential relationship existed between Bessie and Melvin, and that Melvin did not rebut the presumption of undue influence. Accordingly, the chancellor set aside the deed from Bessie to Melvin. The chancellor ruled that the home and its contents were part of Bessie's estate and vested in Ronald pursuant to Bessie's will. Melvin filed a motion to alter or amend the judgment, which the chancellor denied, and a notice of appeal.

## ANALYSIS

¶38. On appeal, Melvin argues that the chancellor clearly erred by finding (1) that Bessie

17

suffered from a weakness of intellect, (2) that he gave grossly inadequate consideration for Bessie's home, (3) that he and Bessie were in a confidential relationship, and (4) that he failed to rebut the presumption of undue influence. Melvin also argues that the chancellor applied the wrong legal standards regarding the adequacy of consideration and the existence of a confidential relationship.

¶39. "[W]e will not disturb the factual findings of a chancellor when supported by substantial evidence unless the Court can say with reasonable certainty that the chancellor abused his discretion, was manifestly wrong [or] clearly erroneous[,] or applied an erroneous legal standard." *Briggs v. Hughes*, 316 So. 3d 193, 198 (¶20) (Miss. 2021) (quotation marks omitted). We defer to the chancellor as to the credibility of the witnesses and the weight of the evidence. *Matthews v. Whitney Bank*, 282 So. 3d 786, 792 (¶21) (Miss. Ct. App. 2019). This Court "does not reevaluate the evidence, retest the credibility of witnesses, nor otherwise act as a second fact-finder. . . . If there is substantial evidence in the record to support the chancellor's findings of fact, *no matter what contrary evidence there may also be*, we will uphold the chancellor." *Bower v. Bower*, 758 So. 2d 405, 412 (¶31) (Miss. 2000) (emphasis added). We review questions of law de novo. *Briggs*, 316 So. 3d at 196 (¶10).

### I. Whether the chancellor clearly erred by finding that Bessie suffered from a weakness of intellect.

¶40. Mississippi law draws "a distinction between 'weakness of intellect' and a total lack of capacity to execute a deed." *Richardson v. Langley*, 426 So. 2d 780, 783 (Miss. 1983). A grantor's "'weakness of intellect' when coupled with another factor, such as grossly inadequate consideration, or the existence of a confidential relationship may be sufficient to

18

warrant the granting of equitable relief." *Id.* Clear and convincing evidence is required to prove the grantor's weakness of intellect. *Smith v. Smith*, 574 So. 2d 644, 654 (Miss. 1990); *Van Quinn v. Quinn*, 278 So. 3d 1160, 1166 (¶¶22-23) (Miss. Ct. App. 2019). "[E]vidence of more than age and sickness on the part of the grantor" is required to support a finding of "weakness of intellect." *Richardson*, 426 So. 2d at 783. "Such weakness must be a weakness of the mental faculties." *Id.* While mere age or physical sickness does not support such a finding, "weakness of intellect" remains "a 'lower standard' than a 'total lack of capacity' to execute a deed." *Ward v. Est. of Cook*, 294 So. 3d 1252, 1260 (¶23) (Miss. Ct. App. 2020) (quoting *Smith*, 574 So. 2d at 653).

¶41. Melvin argues that Ronald failed to show by clear and convincing evidence that Bessie suffered from a weakness of intellect when she deeded her home to him in November 2017. He argues that Bessie lived on her own, handled her own affairs, and had not been diagnosed with dementia or any mental illness when she signed the deed. Therefore, he argues that the chancellor's finding of weakness of intellect is clearly erroneous.

¶42. Regarding weakness of intellect, the chancellor found and ruled as follows:

> Melvin had been added as a co-owner of Bessie's Regions checking account in August of 2017, at the advice of a bank employee when asked about getting a power of attorney. Bessie was hospitalized multiple times in May and June of 2017 for issues including over-medication, vertigo and confusion. Bessie also had ongoing health issues of high blood pressure, diabetes, and back pain. Mr. Brown denied knowledge of Bessie's hospitalizations or health problems in 2017.[11]

---

[11] Melvin testified at trial that he "was not aware of Bessie's multiple hospital visits" in May 2017. He stated "someone"—possibly "somebody at the hospital"—called him "one" time to say that Bessie "had visited the hospital." But Melvin did not remember when that had occurred, and he was "not aware of the situation."

Family members who lived in the neighborhood testified that in late 2017 into 2018 Bessie would get locked out of her house, call to be picked up for a visit and then ask why she was not at her own home. She would then return home and again call to be picked up and return. Both her home and her personal appearance became unkempt, untidy, a large difference in how she had dressed before and always kept a clean and lovely home.

There is also proof that Mrs. Anderson was having trouble handling her own finances as she continued during this time period of 2017 through 2018 to be overdrawn and accumulate fees and many returned items through the Regions checking account. Part of her income was deposited into her Regions Bank checking account, her pension payment. Her social security payment was deposited into her Concordia Bank savings account. Multiple returned items and overdraft fees accumulated as she paid bills out of the Regions checking account. While Melvin testified to "problems" with the Regions account, the issue was simple – there was not enough money placed in the account to cover the items coming out of it. This continued for almost a year after Melvin was placed on the account and after he obtained her power of attorney.

This case involves the standard where the grantor of a deed has "weakness of intellect" combined with other significant factors requiring that the deed be set aside. The courts have distinguished between weakness of intellect and a lack of capacity. Where there is weakness of intellect, coupled with another factor such as grossly inadequate consideration or the existence of a confidential relationship then relief should be granted and the deed set aside. *Smith v. Smith*, 574 So. 2d 644, 653 (Miss. 1990). Weakness of intellect requires evidence of more than age and sickness. The weakness must be a weakness of the mental faculties. The court finds that there are sufficient facts to make a finding that Bessie Anderson was suffering from a weakness of intellect at the time she executed the deed in question. The confusion and changes in Bessie's behavior were noticed as early as 2015, before her husband died. There is undisputed evidence that she had material changes in her lifestyle and habits combined with bouts of serious forgetfulness and confusion. She had repeated instances of locking herself out of her home and setting off her alarm. She was having short term memory lapses where she would call to be picked up, then ask why she was at the neighbor's home, require that she be returned to her own home, and then call again to be picked up to visit. She was 79 years old at the time of the deed execution. She had multiple hospitalizations in 2017 for vertigo and confusion. She was forgetting to pay certain bills such as insurance. Her checking account was continually overdrawn. Her cleanliness habits as to her person and her home

20

had changed dramatically.

While age and sickness are not enough alone to find weakness of intellect, the testimony of multiple witnesses confirmed her weakness of mental faculties. The testimony of Melvin Brown confirmed this – his sister wanted him to take care of the house to prevent it being taken by the state. She owned the house free and clear and had over $8000 in savings. She had monthly income of approximately $1400. When Mrs. Anderson had one month of nursing home care at the end of her life, the monthly bill was $1100. This evidence does not support a danger of Bessie losing her home. . . .

Additional evidence of weakness of intellect includes that Mrs. Anderson never revoked her will. She kept a signed copy of the will in her home, and it was found among her personal papers after her death. There was no indication the signed copy had been revoked by her. The original executed will was kept at Mr. Blalock's office. Mrs. Anderson had no conversation with Mr. Blalock concerning the will nor did she indicate to him a desire to revoke her will. According to Mr. Brown, he had conversations with Mrs. Anderson about her will. He understood her to tell him that she knew how to take care of that. Despite living an additional 3 years after she conveyed the property to her brother, Mrs. Anderson did not revoke her will.

¶43. After review, we conclude that substantial evidence supports the chancellor's findings of fact, and those findings support his ultimate conclusion that Bessie was suffering from a weakness of intellect at the time she executed the deed conveying her home to Melvin. Our Supreme Court has stated that the "critical time" when considering the issue of "weakness of intellect" is the date when the deed was executed. *Smith*, 574 So. 2d at 653. However, the Supreme Court has also considered evidence of the grantor's mental state leading up to that date as circumstantial evidence of the grantor's mental state on that date. *See id.* For example, in *Smith*, the Court held that there was "plentiful evidence that [the grantor] was suffering from 'weakness of intellect'" when he executed the deed in question in May 1987. *Id.* at 654. In support of that holding, the Court noted that "[a] conveyance [the grantor] had

21

made in the early 1980[s] had been set aside," and "[a]nother conveyance made in 1985 had been voluntarily rescinded." *Id.* Moreover, the grantor "had people taking care of his housekeeping, his errands and some of his business affairs," and "[t]here is evidence that in 1985 he was losing his faculties." *Id.* Finally, the Court noted that there was "no evidence of any monetary consideration or any other consideration flowing to [the grantor] for the execution of the deed," nor was there "evidence of any restoration of faculties." *Id.*

¶44. Similarly, multiple family members here testified how Bessie became increasingly confused and forgetful in the years and months before and around the time she deeded her house to Melvin. Moreover, the confusion these witnesses described was significant. Bessie "would call [Brandy] to come get her," but as soon as she went with Brandy to Brandy's house, "she wouldn't know why she was down there" and would want to go back home. As soon as Brandy took Bessie home, Bessie would call Brandy to come get her all over again. Six months before Bessie signed the deed in question, she was hospitalized with an initial diagnosis of "altered mental status" and "dementia" after taking too much of her prescription medicines. Her case manager noted that she was not an accurate historian and exhibited dementia. Although Bessie's health status improved enough for her to be released from the hospital—first, to go to a skilled nursing facility and, then, to return home—that does not necessarily preclude a finding of a weakness of intellect. During this period, Bessie also was suffering from severe back pain among other physical ailments, she had been diagnosed with chronic depression and anxiety, and she was taking at least ten to fifteen prescribed medicines including Hydrocodone, Alprazolam, Escitalopram, and Temazepam. Although

Bessie was not formally diagnosed with "dementia" until October 16, 2018, that singular fact is not controlling. Obviously, Bessie's dementia did not arise suddenly on that date. Dementia is a progressive illness and may exist without a formal diagnosis. On the facts of this case, Bessie's family members' testimony regarding the progressive deterioration of her mental capabilities was sufficient to support the chancellor's finding of weakness of intellect.

¶45. Melvin highlights contrary evidence and testimony in the record, and we agree there is evidence that could have supported a finding that Bessie did *not* suffer from any weakness of intellect at the time she executed the deed in question. But "[i]t requires little familiarity with the institutional structure of our judicial system to know that this Court does not sit to redetermine questions of fact." *Johnson v. Black*, 469 So. 2d 88, 90 (Miss. 1985). "The chancellor is the finder of fact, and the assessment of witness credibility lies within his sole province." *Darnell v. Darnell*, 234 So. 3d 421, 424 (¶8) (Miss. 2017) (brackets omitted). "This Court gives deference to a chancellor's findings in regard to witness testimony, because the chancellor is able to observe and personally evaluate the witnesses' testimony and the parties' behavior." *McNeese v. McNeese*, 119 So. 3d 264, 275 (¶32) (Miss. 2013) (quotation marks omitted). It is also "for the chancellor to determine the . . . weight of [the] evidence." *Powell v. Ayars*, 792 So.2d 240, 243 (¶6) (Miss. 2001). Thus, in a case such as this, "[a]s long as substantial evidence supports the chancellor's findings, we are without authority to disturb them, even if we would have found otherwise as an original matter." *Jenkins v. Jenkins*, 307 So. 3d 473, 477 (¶10) (Miss. Ct. App. 2020) (quoting *Blevins v. Wiggins*, 284 So. 3d 808, 811 (¶10) (Miss. Ct. App. 2019)); *see Smith v. Van Norman*, 234

23

Miss. 526, 530, 106 So. 2d 897, 898 (1958); *see also Sheffield v. S.J. Louis Constr. Inc.*, 285 So. 3d 614, 618-19 (¶8) & nn.4-5 (Miss. 2019) (recognizing that there may be "substantial evidence" to support either of two contrary findings). Because the chancellor's finding of weakness of intellect is not clearly erroneous or manifestly wrong, it must be affirmed.

## II. Whether the chancellor clearly erred by finding that the consideration for Bessie's home was grossly inadequate.

¶46. As discussed above, a chancellor may "set aside a deed upon a finding of a weakness of intellect[] plus [a finding of] grossly inadequate consideration." *Richardson*, 426 So. 2d at 783. Here, we cannot say that the chancellor erred by finding that the consideration for Bessie's home was "grossly inadequate."

¶47. Melvin first argues that Bessie "had the freedom and right to make an inter vivos transfer of her house to whoever she pleased for a good reason or for no reason, and with or without monetary consideration being paid." Melvin cites cases holding that "love" and "affection" are sufficient consideration for a conveyance. *Herrington v. Herrington*, 232 Miss. 244, 250-51, 98 So. 2d 646, 649 (1957); *Holmes v. O'Bryant*, 741 So. 2d 366, 370 (¶19) (Miss. Ct. App. 1999). That is certainly true when the grantor is not suffering from a weakness of intellect or subject to undue influence. *See Herrington*, 232 Miss. at 250-51, 98 So. 2d at 649 (stating that a person "*of sound mind* may execute . . . a deed from any sort of motive satisfactory to him," including "love[ or] affection"). But when, as in this case, the chancellor has found a weakness of intellect on the part of the grantor, the deed may be set aside based on an additional finding of gross inadequacy of consideration.

¶48. Next, although Melvin acknowledges that he paid no cash as consideration for

24

Bessie's home, he argues that "the consideration [for Bessie's home] included [his] agreement (1) to take the house and relieve Bessie of its costs and expenses of the house; (2) Bessie could continue to live in the house for the rest of her life rent-free; (3) if Bessie got to where she could not handle her own affairs, Melvin would act as her attorney-in-fact and under the healthcare directive; (4) if Bessie had to go to a nursing home, Melvin would pay those costs; (5) Melvin would pay for her funeral costs; and (6) Melvin would pay for any debts she couldn't pay." None of these commitments were set out in any written agreement but were all part of an alleged oral agreement between Melvin and Bessie.

¶49. Bessie's home was worth at least $180,000. In comparison, Melvin's "agreement" to allow Bessie to "continue to live in the house" does not seem like meaningful consideration, given that Bessie owned the home free and clear and had every right to remain there before she conveyed it to Melvin. Melvin did pay taxes and insurance on the house from 2018 until Bessie's death in 2021. However, Bessie or Kathy paid the utilities for the home. In addition, Melvin reimbursed himself from Bessie's funds for approximately $3,280 in "Travel Expenses" between 2017 and 2020. Finally, Melvin paid for Bessie's funeral and a final nursing home bill of $944.

¶50. In *Patterson v. Ervin*, 230 So. 2d 563, 565 (Miss. 1970), the chancery court found that a purchase price of $100 per acre for 240 acres in Hinds County total was grossly inadequate based on appraisers' testimony that the land was worth between $165 and $350 per acre. The Supreme Court affirmed, stating that it could not "say the [chancery] court was manifestly wrong in its finding as to inadequacy of price." *Id.*

¶51. We reach the same conclusion here. Comparing what Melvin received to what he gave or orally promised, we cannot say that the chancellor clearly or manifestly erred by finding that the consideration given was grossly inadequate.

## CONCLUSION

¶52. We cannot say that the chancellor clearly or manifestly erred by finding that Bessie suffered from a weakness of intellect when she transferred her home to Melvin or by finding that the consideration Melvin gave for the home was grossly inadequate. A chancellor may grant equitable relief setting aside a deed based upon findings of a weakness of intellect and grossly inadequate consideration. *Richardson*, 426 So. 2d at 783. Therefore, we affirm the judgment of the chancery court setting aside the deed.[12]

¶53. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., WESTBROOKS, McDONALD, LAWRENCE, McCARTY, EMFINGER, WEDDLE AND ST. PÉ, JJ., CONCUR.**

---

[12] Because we affirm the judgment on this ground, we need not address the chancellor's additional findings that a confidential relationship existed between Melvin and Bessie, that a presumption of undue influence arose, and that Melvin failed to rebut the presumption.